Per Curiam; ;
This case was referred to Trial Commissioner Herbert N. Maletz pursuant to Buie 47 (c) by order of the court of April 17, 1964, granting plaintiff’s motion for summary judgment, denying defendant’s cross-motion and entering judgment for plaintiff. The commissioner submitted an opinion, including findings of fact, on August 3, 1965. Exceptions were filed by the parties and the case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion and recommendation for conclusion of law of the commissioner, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is therefore entitled to recover and judgment is entered for plaintiff in the amount of $8,500.52.
*771 OPINION OF COMMISSIONER
Maletz, Commissioner: In May 1954, plaintiff, while employed by a government contractor, was denied by a Defense Department Industrial Personnel Security Board security clearance to work on classified government contracts. He applied for reconsideration in October 1958 which application was allowed in May 1961 when security clearance was granted. His administrative claim for monetary reimbursement under Defense Department regulations having been denied, he brought suit here under such regulations seeking reimbursement for loss of earnings which he allegedly suffered as a result of the action of the department in denying him security clearance. The case came before the court on the parties’ cross-motions for summary judgment, upon consideration of which, the court, on April 17,1964, without oral argument, on the basis of Greene v. United States, 376 U.S. 149 (1964), entered judgment for plaintiff[1] and remanded the case to the trial commissioner for purpose of determining the amount due him under the Defense Department’s Industrial Personnel Security Review Regulation of 1955 (Department of Defense Directive 5220.6, February 2, 1955), paragraph 26 of which provided as follows:
26. Monetary Restitution
In cases where a final determination is favorable to a contractor employee, the department whose activity originally forwarded the case to the Director will reimburse the contractor employee in an equitable amount for any loss of earnings during the interim resulting directly from a suspension of clearance. Such amount shall not exceed the difference between the amount the contractor employee would have earned at the rate he was receiving on the date of suspension and the amount of his interim net earnings. No contractor employee shall be *772 compensated for any increase in bis loss of earnings caused 'by Ms Yolontary action in unduly delaying tbe processing of Ms case under tbis regulation.[2]
Tbe facts pertinent to tbis issue are as follows:[3] Plaintiff, a graduate engineer, was employed from October 1952 to May 1954 by Emerson Radio & Phonograph Corporation (Emerson) at 111 Eighth Avenue, New York City, as a project mechanical engineer at a salary of $135 per week, which was later increased to $142 per week. In this job, he headed a section of mechanical engineers and draftsmen and had complete responsibility for the mechanical design of complex electromechanical equipment consisting of flight simulators to simulate the training procedures for pilots on military aircraft. The nature of the work was to design and put into production a prototype that would enable the Air Force to train pilots for the latest type of bombers without the necessity of awaiting actual production of such aircraft. After plaintiff had started this employment, Emerson made application to the Eastern Industrial Personnel Security Board for his security clearance to work on classified contracts the company had with the government. On May 18, 1954, the Board wrote Emerson that its Screening Division had decided to deny security clearance to plaintiff on the ground that it was not clearly consistent with the interests of national security.[4] On the same day (May 18), Emerson discharged plaintiff as of May 27, 1954, and told Mm that he could no longer have access to its building at 111 Eighth Avenue.
After his discharge, plaintiff began looking for a new job and was hired on June 4, 1954 as quality control manager by the Quiet-IIeet Manufacturing Corporation (Quiet-Heet), Newark, New Jersey, a subsidiary of Emerson, wMch manu *773 factured air conditioners and oil burners. His starting salary in that job was $135 per week which was later increased to about $145 a week, and his duties were to insure that incoming and manufactured materials met specifications and to supervise an unskilled labor force in the Inspection Department.
In early October 1958, Emerson began making plans to disband the facilities of the Quiet-Heet plant in Newark and move them to a plant of Emerson’s in Jersey City where the latter had several million dollars worth of classified government contracts, and also did a substantial amount of civilian work. At about the same time, plaintiff requested the Defense Department to reconsider the decision denying him security clearance. A few weeks after that he was furnished by the department with the specific findings made in his case, and on May 12, 1961, more than 2% years later, he was granted security clearance for access to classified Secret information.
In the meantime, on January 1,1959, the Quiet-Heet facilities in Newark were moved to the Emerson plant in Jersey City and on the same day, plaintiff’s employment at Quiet-Heet was terminated due to the fact that his security clearance had been denied. He was advised by the company that he could not move with Quiet-Heet to the Emerson plant at Jersey City for the reasons that government security work was being carried out at that plant; that his work would be of a supervisory nature which would necessitate his moving about the plant freely; that he lacked security clearance; and that unless he obtained such clearance, he could not in the circumstances be allowed access to the buildings even to work on civilian products. See findings 16 (a) -(c).
Following termination of his employment with Quiet-Heet on January 1, 1959, plaintiff filed an application on January 5, 1959, for State unemployment insurance and about a week later began receiving such payments in the amount of $35 per week, as compared to the $145 weekly salary he had been earning at Quiet-Heet. During 1959, plaintiff was unemployed for all but 18 weeks when he had two jobs — one as a senior industrial engineer at $220 per week, the other with *774 a boiler company at $170 a week. In 1960, be was unemployed for some 20 weeks, having three jobs in this period — two of which paid $175 a week, while the third was temporary office work for a few days during the Christmas period for which he was paid $20.25. He was then unemployed until May 12, 1961, when his security clearance was granted. During the periods in which he was unemployed, plaintiff made continuous efforts to obtain employment in the engineering field. See Kanarek v. United States, 161 Ct. Cl. 37, 43-4, 314 F. 2d 802, 805 (1963), cert. denied 379 U.S. 838 (1964). This he did by visiting company representatives and being interviewed for jobs; by replying to newspaper “help wanted” ads for technical and engineering personnel; by placing classified “situation wanted” ads in newspapers; by contacting personal friends; by going to professional engineering societies; and by registering with a large number of employment agencies. He found, however, that without security clearance it was extremely difficult to secure employment as an engineer.
Turning now to the amount due plaintiff under the 1955 departmental regulation, the “interim” during which he is entitled to reimbursement for loss of earnings extends from May 28, 1954, the day after his discharge from Emerson became effective, to May 12, 1961, when his security clearance was granted. Greene v. United States, supra, p. 161, fn. 16. The loss of interim earnings is measured, therefore, by the difference between the total amount plaintiff would have earned during this whole period at the rate he was receiving on discharge and the total amount he actually earned in that period. See e.g., Borak v. United States, 110 Ct. Cl. 236, 248, 78 F. Supp. 123, 125 (1948), cert. denied 335 U.S. 821; Kaufman v. United States, 118 Ct. Cl. 91, 105, 93 F. Supp. 1019, 1022 (1950) ; Mendez v. United States, 119 Ct. Cl. 345, 348, 96 F. Supp. 326, 327 (1951); Green v. United States, 124 Ct. Cl. 186, 191, 109 F. Supp. 720, 722 (1953); O'Brien v. United States, 138 Ct. Cl. 296, 299-300, 151 F. Supp. 282, 284 (1957) ; 36 Comp. Gen. 220,221 (1956) .[5] Plaintiff was earning $142 a *775 week at the time of bis discharge, at which rate his earnings for the period Maj 28,1954 to May 12,1961 would have been $51,404 (i.e., 362 weeks at $142 per week). During that period his wages totaled $42,903.48, so that his loss of earnings in the period as a result of his having been denied security clearance amounted to $8,500.52 ($51,404 minus $42,903.48). Defendant says, however, that State unemployment compensation payments received by plaintiff during the interim period must be treated as earnings in calculating the amount of monetary restitution and, therefore, deducted from the amount recoverable. The settled law is to the contrary, the principle being established that State unemployment compensation payments are not considered as earnings in determining an employee’s interim “net earnings” for back pay purposes. Marshall Field & Co. v. NLRB, 318 U.S. 253 (1943), affirming 129 F. 2d 169 (7th Cir., 1942); NLRB v. Gullett Gin Co., 340 U.S. 361, 363-64 (1951). Defendant also asserts that plaintiff may not recover for loss of earnings beyond 1954 on the ground that he unduly delayed the processing of his case. It says that if the plaintiff had appeared personally before the Appeal Division on his appeal (see finding 3 (e)), or at least had sought reconsideration promptly after denial of Ms appeal in September 1954 instead of having waited until October 1958, the ultimate favorable decision in his case would not have been delayed to the extent it was and the Appeal Division could have completed favorable action by the end of 1954. Leaving aside the obviously speculative nature of this argument and the fact that under the regulation then in effect the right of confrontation and cross-examination of adverse witnesses was not available at an Appeal Division hearing (see Greene v. McElroy, 360 U.S. 474 (1959)), the short answer to defendant’s contention is that it was not until October 1958 that the department furnished the plaintiff the specific findings on which the Appeal Division’s adverse decision was based (see finding 13), and defendant has failed to adduce any evidence that plaintiff could have obtained such findings before then. To charge plaintiff with undue delay in such circumstances would indeed be anomalous, particularly since the record demonstrates that once having received the findings on which *776 tbe adverse security decision was 'based, he sought repeatedly, though unsuccessfully, to have reconsideration of his case processed quickly to final disposition. And even assuming arguendo that plaintiff unduly delayed requesting reconsideration, the consequence under the 1955 regulation, given the other circumstances present here, would be his inability to recover for loss of earnings during the alleged delay period, i.e., from January 1,1955 to October 1958. But since plaintiff’s net earnings during that period were in excess of what his earnings would have been at the time of his discharge in May 1954 (see finding 29(b)), recovery for that period is precluded in any event.
Plaintiff is entitled to judgment in the amount of $8,500.52.
FINDINGS on Fact
1. Plaintiff is a graduate engineer. He received a Bachelor of Science Degree in 'Chemical Engineering from Virginia Polytechnic Institute in 1949 and a Master of Science Degree in Industrial Engineering from Columbia University in 1954. From June 1950 to March 1951, he was employed in New York City as a field service engineer with a vending equipment company at a salary of $4,000 per year. From March 1951 to October 1952, he was employed at a salary of $135 per week as a project engineer by a company supplying electromechanical equipment for the ‘Signal Corps and other governmental agencies.
2. From October 1952 to May 1954, plaintiff was employed by Emerson Radio & Phonograph Corporation (Emerson) at 111 Eighth Avenue, New York City, as a project mechanical engineer at a salary of $135 per week, which was subsequently increased to $142 per week. In this job plaintiff headed a mechanical section comprised of eight mechanical engineers (all of whom were college graduates) and seven draftsmen and designers and had complete responsibility for the mechanical design of complex electromechanical equipment consisting of flight simulators to simulate the training procedures for pilots on military aircraft. The nature of the work was to design and put into production a prototype that would enable the Air Force to train pilots for the latest *777 type of bombers without the necessity of awaiting actual production of such aircraft. Plaintiff was also responsible for the testing of the sample parts and units going into the simulators.
3. (a) After plaintiff had started working at Emerson, the company made application to the Eastern Industrial Personnel Security Board for permission for his employment on work involving classified security information of the Armed Forces.
(b) On April 27, 1954, the Screening Division of the Eastern Industrial Personnel Security Board wrote plaintiff that it proposed to deny him security clearance to work on classified government contracts; it attached a statement of reasons for the proposed action and advised plaintiff that he could submit a written reply within 10 days, which he did on May 7,1954.
(c) On May 18, 1954, the Board wrote Emerson that its Screening Division had decided that the granting of clearance to plaintiff for access to classified security information was not clearly consistent with the interests of national security and that the appropriate military establishment was being instructed to deny him clearance for such access.
(d) On May 21, 1954, the Board notified plaintiff of the adverse decision of the Screening Division.
(e) On August 31, 1954, plaintiff took an appeal to the Board’s Appeal Division incorporating therein his letter of May 7,1954 to the Board, as well as additional documentary evidence. He did not make a written request for an administrative hearing on his appeal. Under the then current regulation, which was issued in 1953, had he made such request he would have had the right to appear personally before the Appeal Division but would not have been afforded the opportunity to confront and cross-examine adverse witnesses.
(f) On September 23, 1954, the Appeal Division, on the basis of the documentary record before it, sustained the adverse decision of the Screening Division.
(g) Plaintiff was not furnished until October 23,1958 with the specific findings made in his case on the allegations set forth in the statement of reasons that had been sent bim. See finding 13.
*778 4. Meanwhile, as a result of his having been denied security-clearance, plaintiff was discharged by Emerson on May 18, 1954, effective as of May 27, 1954, and was told he could no longer have access to the building at 111 Eighth Avenue. At the time of discharge, he was earning $142 per week.
5. On the following day, May 19, plaintiff returned to the building for purpose of discussing with Emerson’s chief engineer and its vice-president in charge of engineering, the possibility of continuing his employment with Emerson on civilian work. Escorted to their offices by a security officer, these executives of the company re-affirmed to him that his employment had to be terminated because he no longer could have access to the building without a security clearance.
6. After his discharge from Emerson, plaintiff began looking for a new job, for which purpose he registered with various employment agencies and at the Columbia University Engineering Placement Office; followed up newspaper ads; and contacted persons he knew in the engineering field.
7. (a) In June 1954, Emerson had its engineering department, where plaintiff had worked, at 111 Eighth Avenue, New York City, and a manufacturing plant at 14th and Cole Streets, Jersey City, New Jersey. Also in June 1954, Emerson owned a 65 percent stock interest in the Quiet-Heet Manufacturing Corporation (Quiet-Heet), 46 Oliver Street, Newark, New Jersey, which manufactured air conditioners and oil burners. Later that year, Emerson acquired the balance of the stock of Quiet-Heet.
(b) No government work was performed at the Quiet-Heet plant and security clearance was, therefore, not necessary.
8. On June 4, 1954, plaintiff was interviewed for employment by Louis Pacent, vice-president in charge of manufacturing of Quiet-Heet, who had previously worked for Emerson where he got to know the plaintiff. In the course of the job interview, plaintiff told Pacent that he (the plaintiff) had been employed by Emerson on government work; that he had been denied security clearance; and that he, therefore, could no longer be employed on government projects. Pacent checked with Emerson, obtained verification of plain *779 tiff’s statements, was advised that he was a capable engineer, and thereupon, on the same day (June 4), hired him as quality control manager at the Quiet-Heet plant at a starting salary of $185 per week. In his employment application which he filled out and signed on the same day, June 4,1954, plaintiff wrote that his reason for leaving Emerson was “Transfer to Quiet-Heet”.
9. On June 7, 1954, plaintiff started working for Quiet-Heet in its production department, 46 Oliver Street, Newark, New Jersey. As quality control manager, it was his job to check incoming materials against specifications to determine that purchase requirements were met; to inspect air conditioners and oil burners to insure they met production specifications; and to supervise an unskilled labor force in the Inspection Department.
10. Plaintiff worked at the Newark plant of Quiet-Heet as quality control manager from June 7,1954 to January 1,1959. For part of this period, from 1954 through 1957, he was on the payroll of Quiet-Heet; for the latter part of this period, from January 1,1958 to January 1,1959, he was on the payroll of Emerson (which, as indicated in finding 7(a); had previously acquired full ownership of Quiet-Heet).
11. Beginning on or about January 1, 1957, plaintiff’s salary with Quiet-Heet was somewhat in excess of $145 per week.
12. On or about October 6, 1958, Emerson began making plans to disband the Quiet-Heet facilities in Newark and move them to the Emerson plant in Jersey City which had several million dollars of classified government contracts spread throughout that plant, and also did a substantial amount of civilian work there.
13. On October 10, 1958, plaintiff wrote the Defense Department requesting reconsideration of the decision denying him security clearance. On October 23, 1958, the Director of the Department’s Office of Industrial Personnel Security Eeview wrote him that “It is the current practice of this Office to furnish to the individual concerned the specific findings made in his case on each of the allegations set forth in the Statement of Reasons furnished to him,” adding that *780 “Since this was not done in [plaintiff’s] case, this information is being furnished at this time.” He thereupon provided plaintiff with the specific findings made by the Appeal Division of the Eastern Industrial Personnel Security Board in 1954, and enclosed a copy of the then current Defense Department regulation issued on February 2, 1955, advising plaintiff to submit whatever information he could with respect to a specified item which might serve as good cause for reconsideration. On January 14, 1959, plaintiff filed supporting papers on behalf of his petition for reconsideration and on February 20,1959 was advised that good cause for reconsideration had been shown within the meaning of the 1955 regulation. An investigation of his case was then undertaken. Plaintiff thereafter wrote the Defense Department several times in 1959 complaining of delay by the department in proceeding with his case, stating that such delay was causing him great hardship and urging that his case be expedited. The department, in reply, advised plaintiff in December 1959 that final disposition of his case could not be made without further proceedings in which he would be afforded opportunity for a personal appearance and that because of the still unresolved questions concerning the authority of the department as a result of the Supreme Court decision in Greene v. McElroy it was not possible to go forward with his case at that time. In April 1960, the department informed plaintiff that following the completion of its investigation, his case had been considered and that on the basis of the present record granting of security clearance was not warranted; that a new hearing would be granted if requested, but that some delay might be experienced pending issuance of a new regulation. Hearings were held before a Defense Department board in November 1960 and January 1961, and on May 12,1961, as the outcome of plaintiff’s October 1958 request for reconsideration, security clearance was granted for his access to information classified Secret on the basis that such clearance was clearly consistent with the national interest.
14. In the meantime, on January 1, 1959, the Quiet-Heet facilities in Newark were disbanded and moved to the Emerson plant in Jersey City. As set forth in finding 12, Emerson *781 had several million dollars of classified government contracts spread throughout its plant in Jersey City and also did a substantial amount of civilian work there. The classified work that was done in the J ersey City plant was physically separated from the non-classified work and access to the areas in which classified work was being earned on was controlled by a system of admission only on the 'basis of specified identification. Not all persons who worked at the Jersey City plant were required to have security clearance. Thus, as of October 6, 1958, at which time the move from Newark to Jersey City was being planned, the total number of employees at the J ersey City plant was approximately 1,800, of which number some 1,350 had some type of clearance, while approximately 450 had no clearance. As of February 18,1959, shortly after the move, there were some 2,200 employees at the plant, of which number 1,356 had some kind of clearance, while the balance, 844, held no clearance. All employees were required by the company to wear badges, and the buildings, fences, gates and grounds were guarded by watchmen. Among those working at the Jersey City plant after January 1, 1959 were nine plant employees who had been denied security clearance prior to 1958 and were still employed there thereafter. With possibly one exception, these employees were union workers engaged in the assembly of radios and television sets or stock-room work.
15. Plaintiff’s employment at Quiet-Heet terminated on January 1, 1959, when the plant was moved from Newark to the Emerson plant at Jersey City. He received a pay check up to and including January 3,1959.
16. (a) It is specifically found that plaintiff’s job was terminated on January 1, 1959, because of his having been denied security clearance; that no job of any kind was offered to him by Emerson or Quiet-Heet when the Quiet-Heet plant was moved; and that he did not resign his job at Quiet-Heet. More particularly, the evidence in the record establishes that plaintiff was told by 'Stanley Abrams, the then president of Quiet-Heet, and Joseph Longin, its executive vice-president, that he could not move with Quiet-Heet to the Emerson plant at Jersey City for the reasons that government security wrok *782 was being done at the Jersey City plant; that plaintiff’s work would be of a supervisory nature which would necessitate his moving about the plant freely; that he lacked security clearance; and that unless be obtained such clearance, he could not in the circumstances be allowed access to the buildings even to work on civilian products. Abrams and Longin felt that in plaintiff’s case, since he had been denied security clearance and his supervisory work at the Jersey City plant would require his movement about that plant, discretion should be the better part of valor and he should not be allowed to work therein.
(b) Abrams, who was president of Quiet-Heet in. 1958 and 1959 and is presently vice-president and assistant to the president of Emerson, testified on behalf of the defendant that to the best of his recollection plaintiff was offered employment at the Emerson Jersey City plant when the Quiet-Heet move took place. It is found that this testimony lacks probative value in light of Abrams’ further testimony that he “couldn’t distinctly say that we had offered him a job” and that he “couldn’t say that positively”; that he couldn’t specifically answer that he specifically made a job offer to plaintiff; that he didn’t know and was unable to recall what job plaintiff was offered or what the salary was; that he was unable to recall anything about the nature of the job; and that he assumed that the job “would be something in connection with either incoming inspection or that type of work” though he was sure that the job wasn’t one in charge of incoming inspection. Michael Ciavolino, assistant personnel manager of Emerson since mid-1957, testified on 'behalf of defendant that to the best of his recollection when the Quiet-Heet move took place, plaintiff was offered a job as a foreman in the incoming-inspection department at the Jersey City plant at the same salary of about $145 a week he had been receiving at Quiet-Heet and that, to the best of his recollection, plaintiff declined the job offer. This testimony likewise lacks probative value in view of Ciavolino’s further testimony that he neither knew nor had any recollection of whether he himself had made the job offer; that it was possible that he had not made the offer; that he didn’t know of anyone who had made the offer; and *783 that it was possible that an offer of a job to plaintiff was never made.
(c) It is further found, based on observation of their demeanor on the witness stand, that Abrams’ and Ciavolino’s testimony is not credible.
17. Following termination of his job at Quiet-Heet on January 1,1959, plaintiff proceeded to seek employment elsewhere. Being out of a job, he filed an application, on January 5, 1959, for State of New Jersey unemployment insurance, stating his employment was terminated due to a plant move. His maximum benefits in 1959 under the New Jersey Unemployment Compensation law were $35.00 a week for 26 weeks. As set forth in finding 11, plaintiff’s salary at Quiet-Heet had been somewhat in excess of $145 per week. Plaintiff received unemployment insurance in the amount of $35.00 per week starting about one week after he filed his application.
18. After being unemployed for about nine weeks, from January 2,1959 through the week ending February 27,1959, plaintiff was employed on or about March 1,1959 by Precision Industrial Design Company (Precision), Newark, New Jersey, as a senior industrial engineer, doing space planning, plant, office and laboratory layout and facilities planning at the Poughkeepsie, New York plant of a client, the International Business Machines Corporation. Plaintiff worked for Precision until the end of June 1959 — a period of some 17 weeks — at a salary which during most of this period amounted to $220 per week. During this employment the Army’s Counter-Intelligence Corps had been conducting a full field investigation of plaintiff in connection with the application he had filed on October 10,1958, for reconsideration of his denial of security clearance. See finding 13. In the course of that investigation, agents of the CIC interviewed IBM in mid-June 1959. About two weeks later, plaintiff was discharged by Precision which told him the reason was that IBM thought he was an industrial spy and thought he was using his position to get information for a competitive company.
19. In the spring of 1959, plaintiff went to see Longin of Emerson and asked him if he could help him get a j ob. Longin had no j ob for him at Emerson at the time.
*784 20. Plaintiff thereafter worked for one week in July 1959 for the Manville Boiler Company at a salary of $170.
21. Following this, plaintiff was unemployed for some nine months — from July 10,1959 to April 1,1960.
22. During the periods in which he was unemployed, plaintiff made continuous efforts to obtain engineering employment by visiting and being interviewed by company representatives; by replying to newspaper ads for technical and engineering personnel; by placing classified ads; by contacting personal friends; by going to professional engineering societies; and by registering with a large number of employment agencies. He found that without security clearance it was extremely difficult to secure employment as an engineer.
23. On or about April 1, 1960, plaintiff, as a result of answering an ad, obtained employment with Modern Swimming Pool Company, White Plains, New York, at a salary of $175 per week and worked there for some 19 weeks, until August 5,1960.
24. Thereafter he was unemployed for two months, until October 1, 1960, when he secured employment as an engineer at Zell Products Corporation, Norwalk, Connecticut, at a salary of $175 per week, where he worked for 12 weeks, until the latter part of December 1960. In the course of being interviewed for that job, plaintiff indicated he had left Emerson of his own accord.
25. During the Christmas rush in December 1960, plaintiff worked for Olsten’s Temporary Office Personnel for a few days doing office work and was paid $20.25.
26. (a) He was then unemployed from the end of December 1960 until May 12,1961.
(b) On May 12,1961, the Defense Department, as the outcome of plaintiff’s application for reconsideration of his denial of security clearance, which had been filed on October 10, 1958 (see finding 13), advised plaintiff that the granting to him of authorization for access to information classified Secret was clearly consistent with the national interest.
27. (a) In June 1961, plaintiff applied to the Defense Department for monetary restitution under a Department of *785 Defense regulation issued July 28, 1960, which, superseded the previous regulation of February 2,1955. The claim was denied in August 1961 on the ground that under the 1960 regulation a necessary condition for monetary restitution was that the Board making the final favorable determination find that the former adverse decision was unjustified. In plaintiff’s case, the department advised, the Board had found that the previous decision denying security clearance was not unjustified.
(b) Plaintiff wrote the department several weeks later questioning its decision and reiterating that he was entitled to monetary restitution. He said that there was one continuous proceeding in his case since 1954; that there was a serious legal question as to whether a 1953 regulation was not applicable rather than the 1960 regulation; and that it was unfair and possibly illegal for the government to deprive an individual of loss of earnings he suffered under an earlier directive. The department replied in September 1961 that the 1960 regulation was the only regulation then in effect and was the only one governing the disposition of plaintiff’s claim.
28. As set forth in findings 2 and 4, plaintiff was earning $142 per week at the time he was discharged by Emerson as of May 27, 1954. If plaintiff had earned $142 per week for the period May 28, 1954 to May 12, 1961, his total earnings would have been $51,404 (i.e., 362 weeks at $142 per week).
29. (a) During the period from May 28,1954 to May 12, 1961, plaintiff’s wages totaled $42,903.48.
(b) Such wages were received as follows:
1954 - $3, 695. 00 (May 28 through December 31)
1955 - 7,285. 00
1956 - 7,400.00
1957 _ 7,754.25
1958 - 7, 539. 98
1959 - 3, 784. 00
1960 - 5,445.25
1961 - 0. 00 (January 1 through May 12)
Total -$42, 903.48
*786 30. Plaintiff’s loss of earnings during the period from May 28, 1954 to May 12, 1961 resulting directly from the denial of security clearance amounted to $8,500.52 ($51,404 minus $42,903.48).
31. (a) During the period from May 28,1954 to May 12, 1961, plaintiff received unemployment insurance payments totaling $2,245.
(b) Such unemployment insurance payments were received as follows:
1959 $875.00
1960 420.00
1961. 950. 00
Total_$2,245.00
CONCLUSION OE Law
Upon the foregoing findings of fact, which are made part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover of and from the United States eight thousand five hundred dollars and fifty-two cents ($8,500.52) and judgment is entered for plaintiff in that amount.

 Subsequently, the court, on July S, 1964, denied defendant’s motion to vacate judgment and to either dismiss the petition, calendar the case for oral argument, or refer it to a commissioner for a trial on the merits. Defendant contended in that motion that the Greene decision did not support a judgment for plaintiff here; that plaintiff’s claim was barred by the statute of limitations ; and that if the claim was not dismissed there was a genuine issue of fact as to whether or not plaintiff’s employment with the government contractor was terminated in May 1954. See finding 4.

 This provision is “equitably designed to compensate employees whose security clearance has been improperly or wrongly denied.” Greene v. United States, supra, p. 161.

 A number of findings requested by defendant deal with the question of liability but have no relevancy to the single issue presented here, i.e., the amount due plaintiff under the 1955 departmental regulation. For this reason, findings have not been made on the subject matter of such requests by defendant.

 Plaintiff took a written appeal to the Board’s Appeal Division which on September 23, 1954 sustained the adverse action of the Screening Division.

 without merit is plaintiff’s contention that he is entitled to recover on a weekly basis for the difference between the actual amount received and the amount he would have received, under which method wages plaintiff earned in the interim in excess of the rate he was receiving on discharge would not be offset in determining his interim net earnings.