Per Curiam :
This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a). The commissioner has done so in an opinion and report filed on Octo *374 ber 18, 1966. Exceptions to the commissioner’s findings and opinion were filed by defendant, briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with a slight modification, it hereby adopts the same as modified as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $16,161.43.
OriNioN oe Commissioner
Bennett, Chief Commissioner: This is a claim for back salary under certain Department of Defense regulations. Plaintiff claims salary lost by reason of a security-clearance determination, later reversed. Defendant says that plaintiff lost his job before any final adverse decision on his security clearance and that plaintiff’s conduct delayed a decision on administrative appeal, thus vitiating his claim. For reasons given hereafter, it is concluded that plaintiff is entitled to recover. The facts cover a span of several years and are somewhat involved.
Plaintiff, a citizen of France, is authorized access to the courts of the United States by a Convention of Establishment With France, November 25,1959 [1960] 11 U.S.T. & O.I.A. 2398, T.I.A.S. No. 4625 (effective December 21, 1960), and which accords citizens of the United States equal access to the courts of France. Plaintiff is a graduate engineer and was employed on June 8, 1952, by Hughes Aircraft Company, Culver City, California, as an aeronautical engineer. The nature of his work was to design and test aircraft, aircraft structures, components, and aircraft systems.
Prior to plaintiff’s employment by Hughes, and apparently in contemplation of plaintiff’s potential employment on work requiring his access to Government classified information, Hughes made application to the Air Force in March 1951 for his access authorization to data classified “Confidential.” On January 21,1952, the Air Force notified Hughes that temporary consent for plaintiff’s access to work on classified matters had been granted until January 21,1953. On June 2,1952, *375 Hughes made inquiry with respect to its initial application on plaintiff’s behalf, and the Air Force merely reiterated that plaintiff had been granted a temporary confidential clearance. Then, on January 21, 1953, the Air Force advised Hughes that plaintiff’s clearance had been extended to July 21,1953.
After this extension expired, Hughes made several attempts to renew plaintiff’s clearance and was finally informed by the Air Force, on October 22,1953, that plaintiff’s interim clearance would not be renewed and that an appropriate letter of consent or denial would be furnished when available. Finally, on November 10,1953, the Western Industrial Personnel Security Board (WIPSB), advised plaintiff that the Screening Division had tentatively denied consent for his access to classified matter. Subsequently, on November 24, 1953, the Hughes Company notified plaintiff that his employment was being terminated November 27, 1953, only because it was not successful in obtaining a security clearance for him.
After his discharge, plaintiff sought to obtain employment in Long Beach, California, and in New York, without success. From previous experience, during a period of clearance suspension and upon evaluation of his chances to obtain employment in the United States in an engineering capacity, plaintiff decided it was necessary to accept a position in Switzerland with Manex Machinery Corporation. Prior to his departure on January 2, 1954, plaintiff responded at length to the statement of the reasons given for the tentative denial of his security clearance and submitted additional data. He also left instructions with his wife, who remained in California, to forward his mail to Geneva, Switzerland.
Plaintiff arrived in Geneva on or about January 15, 1954, and received a communication there from the WIPSB advising him that since his employment with Hughes was terminated, a security clearance was no longer required and, therefore, his case was closed. Plaintiff responded on January
19.1954, informing the WIPSB that, in his opinion, the sole reason for his discharge was the denial of his clearance and requesting reconsideration.
Upon receiving this latter statement, the WIPSB reopened plaintiff’s case and issued a final denial on February 10.1954, which was sent to plaintiff by registered mail at his *376 Long Beach, California, address and marked “Deliver to Addressee Only.” The envelope enclosing said notice of February 10, 1954, from the WIPSB indicated that it was readdressed to plaintiff’s forwarding address in Geneva, Switzerland, but was returned to the WIPSB by the post office on February 23,1954, since, in the latter’s view, it could not be forwarded outside the United States.
Having received no response to his letter of January 19, 1954, plaintiff wrote the Secretary of Defense on March 25, 1954, in relation to his clearance and forwarded a copy of the letter to Congressman Clyde Doyle, whose assistance he had enlisted in connection with his security and naturalization difficulties. In May 1954, plaintiff wrote the Congressman informing him that the Secretary of Defense had not replied and requested further assistance.
By virtue of a series of communications between the Air Force, Congressman Doyle, plaintiff, and the WIPSB, plaintiff finally learned in late June 1954 that a final decision had been rendered in his case. Plaintiff then suggested that the decision of February 10, 1954, be forwarded through the State Department in the diplomatic pouch so that it could be delivered to him by the local American consulate in Geneva.
As previously noted, plaintiff came to Geneva in January 1954 to work for Manex Machinery Corporation. Plaintiff’s employment with Manex was initially on a commission basis for the sale of machine tools, and he spent a considerable amount of time familiarizing himself with the market. He also received $250 from Hughes for working on a special calculation project while in Switzerland. In June 1954, plaintiff received a direction from Manex to draw the specifications for a new type of machine tool and at that time he was put on a salary basis. Plaintiff was told that if his specifications were satisfactory, and if the product was accepted by the manufacturers, he would supervise the construction of the machine in Turin, Italy. This project did result in plaintiff’s moving to Turin in September 1954, following a month’s camping trip in southern France in August with his 7-year-old son, who had been sick during the winter in Geneva. This work required his presence in *377 Turin from September 1954 until July 1955. By the time the letter of transmittal arrived in Geneva in August, plaintiff had already left that city and the letter containing the February 10, 1954, decision was finally received by him in Turin, Italy, on September 24,1954.
Through October and November 1954, plaintiff corresponded with the WIPSB relative to having his appeal hearing in Europe and informed the board that his financial status at that time precluded his returning to the United States. Although the board rejected the proposed procedure, it did suggest that the matter be left in a pending status until such time as it was convenient for plaintiff to return to the United States and attend a hearing. The reentry permit which plaintiff held expired on December 23, 1954. Plaintiff promptly made application for an extension and was finally advised in May 1955 that it had been granted to December 23,1955.
In July 1955, plaintiff received approval from the president of Manex to go to the United States for a hearing relative to his security clearance. Between July 1955 and September 14,1955, when plaintiff left for New York, plaintiff had to wind up his employment obligations and find someone to care for his young son, which precluded an earlier return to the United States.
A hearing was scheduled for, and held on, September 21, 1955, before the • Eastern Industrial Personnel Security Board (EIPSB) which rendered its decision on October 11, 1955, granting plaintiff security clearance and reversing the earlier adverse determination by the WIPSB.
On October 13, 1955, plaintiff filed a claim with the Air Force for reimbursement for loss of wages. Plaintiff’s claim was denied on October 9, 1959. The Air Force decision stated two grounds: Plaintiff’s employment was terminated before the Security Board’s final determination and thus was not defendant’s fault, and plaintiff’s absence from the United States delayed his appeal hearing. His administrative claim for monetary reimbursement under Defense Department regulations having been denied, plaintiff brought suit in the Court of Claims under such regulations, seeking reimbursement for loss of earnings which he al *378 legedly suffered as a result of the action of the WIPSB in denying him security clearance.
Once unraveled, this case presents two issues for determination: First, whether plaintiff’s claim is barred by the fact that his employment was terminated November 27, 1953, prior to the final decision of the Screening Division on February 10,1954; and, second, if there is a governmental liability, whether any part of the time lapse between the tentative denial of clearance on November 10,1953, and the favorable final determination on October 11, 1955, was attributable to plaintiff’s voluntary action unduly delaying the processing of his case.
Compensation for interim loss of wages is permitted by section V, paragraph 23, of the Industrial Personnel and Facility Security Clearance Program, effective May 4,1953, which provided:
23. Monetary Restitution. In cases where a final determination is favorable to a contractor employee (but not a contractor), the Appeal Division will instruct the Executive Secretary to recommend to the department whose agency originally referred the case that the contractor employee be reimbursed for any loss of earnings resulting directly from the denial or revocation of clearance during the interim in the amount not to exceed the difference between the amount he would have earned at the rate he was receiving upon the date of the initial denial or revocation of clearance and the amount of his interim net earnings.
Compensation is also sanctioned by section 67.5-4, Department of Defense Directive 5220.6, 20 Fed. Beg. 1553, 1559 (1955), which reads:
§ 67.5-4 Monetary Restitution. In cases where a final determination is favorable to a contractor employee, the department whose activity originally forwarded the case to the Director will reimburse the contractor employee in an equitable amount for any loss of earnings during the interim resulting directly from a suspension of clearance. Such amount shall not exceed the difference between the amount the contractor employee would have earned at the rate he was receiving on the date of suspension and the amount of his interim net earnings. No contractor employee shall be compen *379 sated for any increase in his loss of earnings caused by his voluntary action in unduly delaying the processing of his case under this part.
Although a question has been raised concerning which regulation is applicable to the facts determinative of the second issue, there can be no real dispute over which regulation governs the liability of the Government. The ultimate result on the issue of liability will be identical under either regulation. It is not necessary, therefore, to pass on which regulation is controlling.
The contention of the defendant is that since plaintiff’s employment was terminated prior to the final decision of the Security Board on February 10, 1954, such termination was independent of Air Force action and, thus, there was no loss of earnings resulting directly from the denial or revocation of clearance. Defendant attempts to fortify its position by asserting that plaintiff’s employer, Hughes, did not terminate his employment because there had been a denial or revocation of clearance, but by reason of the fact that it had been unable to obtain a clearance for plaintiff.
This exercise in semantics is without merit. Whatever distinction there is between an employee being discharged due to a denial of clearance and an employee being discharged due to a failure to obtain a clearance, which in a sense is a denial, certainly cannot be made the basis for adjusting the rights and liabilities of the parties herein involved under the Defense Department regulations.
The facts are clear. Prior to plaintiff’s employment, Hughes made application to the Air Force for his security clearance and was notified that a temporary clearance had been granted. This clearance was extended until July 21, 1953, and after its expiration Hughes made numerous attempts to have it renewed. In addition, Hughes made inquiry with respect to its initial application for plaintiff’s clearance. This correspondence continued for a period of 32 months, from March 1951 until October 22, 1953, when Hughes was finally notified that plaintiff’s clearance would not be renewed. Then, on November 10,1953, the Screening Division tentatively denied his clearance. In turn, Hughes notified plaintiff on November 24,1953, that his employment *380 was being terminated November 27, 1953. Hughes wrote, “This action is being taken for one reason only, our lack of success in obtaining security clearance for you from the United States Air Force.”
It is clear that plaintiff’s discharge was the direct result of the denial or revocation of his temporary clearance, and he is entitled to monetary restitution. Such discharge was not independent of Air Force action. To hold otherwise would allow the Government to escape liability effectively by merely delaying the clearance process and withholding a final decision until some time after the contractor-employee had been discharged. Naturally, an employer, heavily engaged in defense contract work for which employees with security clearances were essential, could not afford to maintain, during a period of inordinate delay, those employees who were unable to obtain, and in essence were denied, a clearance. To deny monetary reimbursement on such a ground would run counter to the very intent of the provisions of the regulations authorizing restitution. It may be noted, also, that the regulations do not distinguish between denial or suspension of clearance, temporary or otherwise.
Another factor which militates against adopting the defendant’s argument is this court’s recent decision in Williamson v. United States, 166 Ct. Cl. 239 (1964). On the facts, the Williamson case and this case are strikingly similar. Plaintiff, an attorney, was employed by the Bendix Aviation Corporation on May 28, 1951. In July 1951 Bendix requested a security clearance for the plaintiff from the Navy so that he could work on the company’s classified contracts. On December 3, 1953, over 30 months later, the Screening Division tentatively denied his clearance. On December 30, 1953, Bendix notified the plaintiff that he was being discharged, effective January 15, 1954. On January 19, 1954, the Screening Division rendered a final decision affirming its tentative denial of clearance. On appeal plaintiff was successful in having the adverse decision reversed on July 15, 1954, and was awarded monetary restitution by the Department of the Navy on April 22,1957, for his loss of earnings between January 15 and July 15, 1954.
*381 Although the plaintiff was afforded administrative relief in the Williamson case and the court’s dismissal of the claim was on other grounds, it is pertinent to note that this court recognized in its opinion that under the regulation of May 4, 1953, plaintiff was entitled to his net loss of earnings. The initial denial in both instances was a tentative decision which led to a termination of employment prior to a final determination by the Screening Division. That recognition is persuasive authority for the conclusion that governmental liability follows from an improper tentative denial of clearance.
Having determined that plaintiff is entitled to compensation, the amount due him under the regulations must now be considered. As noted earlier, compensation is permitted under the May 4, 1953, regulation following a final determination favorable to a contractor-employee “for any loss of earnings resulting directly from the denial or revocation of clearance during the interim in the amount not to exceed the difference between the amount he would have earned at the rate he was receiving upon the date of the initial denial or revocation of clearance and the amount of his interim net earnings.”
The regulation, which became effective February 2, 1955, added: “No contractor employee shall be compensated for any increase in his loss of earnings caused by his voluntary action in unduly delaying the processing of his case under this part.”
Plaintiff contends that his right to monetary restitution must be determined under the 1953 regulation; that, since the 1955 proviso was not in existence at the time of his separation or throughout 1954 when he was formulating the ground rules of his appeal, it would be a retroactive application of the 1955 regulation if it were applied to these proceedings. Alternatively, assuming the 1955 regulation governs, the plaintiff maintains that the uncontradicted course of events conclusively demonstrates that he did not unduly delay the processing of his case.
The defendant responds that it is immaterial which monetary restitution regulation is applicable, since plaintiff could not deliberately and voluntarily cause undue delay in the *382 processing of bis case and nevertheless have a right to recover. Specifically, the 'Government states: “This is basic, general law, not dependent upon any express language, or lack of express language, in the monetary restitution regulation.” Furthermore, defendant argues, the prolonged delay between the time plaintiff left the United States and his appeal hearing in September 1955 resulted from plaintiff’s own action and was not defendant’s responsibility. Finally, the Government argues, if plaintiff is entitled to reimbursement, the maximum amount that should be awarded is a sum representing the “interim” between November 27,1953, the date of discharge, and March 27, 1954, the time it would have taken to complete the hearing process but for plaintiff’s actions.
Whatever amount of compensation plaintiff is entitled to, there can be no doubt that he could not purposely and deliberately stall the hearing process with an eye toward increasing his claim for loss of earnings against the Government. Therefore, defendant’s first contention that compensation for his loss of earnings would be unwarranted under either regulation, if such loss were caused by his undue delay, since then it would not be reimbursement for a “loss of earnings resulting directly from the denial or revocation of clearance,” is based on sound reasoning and common sense.
In concluding that the supplementary limitation of the 1955 regulation is thus equally applicable to the 1953 regulation, although only implied by the latter, this case turns on whether plaintiff voluntarily delayed the processing of his claim. On the facts, the answer to this question must be in the negative.
Defendant places great emphasis on the fact that plaintiff left the United States on January 2,1954, and was not available thereafter for a hearing until September 21, 1955. In fact, almost every facet of defendant’s argument focuses on whether or not plaintiff chose a reasonable course of action in accepting employment in Europe.
Careful analysis of the facts reveals that plaintiff met his burden of proof by showing that he could not obtain employment as an engineer in the United States. Ample testimony is in the record relating to plaintiff’s attempts to secure employment both in California and in New York in an engineer *383 ing capacity. He was not to be compelled to accept employment “far below Ms level of intelligence and level of Ms former employment in order to avoid the implication of failure to seek employment.” Kanarek v. United States, 161 Ct. Cl. 37, 43, 314 F.2d 802, 805 (1963), cert. denied, 379 U.S. 838 (1964). The defendant, on the other hand, offered not even a scintilla of evidence concerning plaintiff’s ability to secure employment in the United States. In light of this failure, it is safe to conclude that plaintiff pursued a reasonable course of action in accepting a position with Manes Machinery Corporation in Switzerland.
Defendant next says that reimbursement Should only be awarded for the “interim” between November 27, 1953, the date of discharge, and March 27,1954, the time it would have taken to complete the hearing process but for plaintiff’s actions. Leaving aside the obviously speculative nature of tMs argument, it is apparent that since plaintiff followed a permissible course of action in leaving the United States, he cannot be penalized for not being in California to receive, personally, the final decision of February 10, 1954. Considering the findings, it is not plausible to estimate a disposition of the case by March 27, 1954. Compare Margolin v. United States, 175 Ct. Cl. 768 (1966).
It is also pertinent to note that prior to departing from the United States, plaintiff communicated with the Security Board and received a reply in Geneva, Switzerland, that Ms case was closed. He responded immediately requesting reconsideration. This further illustrates plaintiff’s grave concern over Ms clearance status and prompt attempts to remedy his situation.
This brings us to the final decision of February 10, 1954. As noted previously, this decision was sent to plaintiff at his California address, via registered mail, marked “Deliver to Addressee Only.” The letter was then readdressed to plaintiff’s forwarding address in Geneva, Switzerland, and returned to the WIPSB on February 23,1954. The post office advised that the letter could not be delivered outside the United States. The letter was eventually delivered to plaintiff in Turin, Italy, on September 24,1954.
*384 The defendant asserts that since plaintiff did not notify the WIPSB of his departure, and further, that since it was impossible to forward the letter outside the United States, such delay is attributable to plaintiff. In this view I cannot concur. The facts are that on February 23, 1954, when the WIPSB letter of February 10 was returned, carrying on the envelope plaintiff’s Geneva forwarding address where it had been written by his wife, defendant knew that address but chose to sit idle until informed by the plaintiff of the consular method of delivery. The letter was only then forwarded to Geneva, 7 months late. This certainly negates any notion of impossibility of foreign delivery but underscores defendant’s indifference, how it kept plaintiff in the dark, and how it served to delay the final hearing. It is important to consider that only through plaintiff’s continuous efforts in communicating with Congressman Doyle did he finally acquire knowledge that his case had been reopened and a final decision rendered. The delay in transmitting this decision must rest with defendant. It was defendant’s own inaction which was responsible for the delayed letter delivery.
Upon eventual receipt of the decision rendered February 10, 1954, plaintiff was already obligated by reason of his employment to remain in Europe until July 1955. The delay engendered by reason of the plaintiff’s employment, as will be demonstrated, is not, under the circumstances of this case, “voluntary action * * * unduly delaying the processing of his case.”
The defendant predicates its argument on an analogous principle applicable to federal employee suits, that back pay for improper dismissal should be denied where the employee is not ready, willing, and able to resume his position during the period for which relief is sought. Keith v. United States, 174 Ct. Cl. 284 (1966); Everett v. United States, 169 Ct. Cl. 11, 16, 340 F.2d 352, 355 (1965). The latter opinion collects the cases construing this requirement.
Defendant maintains that in the instant case plaintiff must be ready, willing, and able to go forward with the clearance process in order to recover. In essence, defendant puts forth the proposition that since plaintiff was required by his employment to remain in Europe, he was not ready, *385 willing, and able either to resume his work or proceed with his clearance, and therefore recovery should be denied. Such a position cannot be sustained either by reason or authority. Given the circumstances present here, plaintiff was always ready, willing, and able to work as an engineer and to go forward with the clearance process.
The objective of that prerequisite “is to insure that federal employees who are improperly dismissed will recover no more than the amount actually lost as a result of the separation.” Everett v. United States, supra at 16. “If the employee was incapable of performing the work for which the pay was to be received, it follows that he has lost nothing which he would have earned but for the wrongful separation.” Armand v. United States, 136 Ct. Cl. 339, 343 (1956).
This rule, however, undoubtedly presupposes that a claimant not be made unready, unwilling, and unable through the fault of the Government. Plaintiff’s dilemma was precipitated by the Government’s improper action and aggravated by its inaction with respect to the final decision of February 10, 1954. Naturally, plaintiff had to accept employment during the interim and, also, the conditions accompanying his position.
Furthermore, a careful reading of the authorities collected in Everett v. United States, supra, will reveal that recovery has been denied on this basis only where the claimant was either physically or mentally disabled during the “interim” or voluntarily made himself unavailable for any employment, independent of Government action or inaction. In such cases there is no loss of earnings due to the improper dismissal. In the present case, plaintiff was not incapable, his loss was real, and he was always ready, willing, and able to proceed with his clearance within the meaning of that phrase.
If analogies are to be indulged in, certainly the principle of mitigation of damages bears mentioning. See Schwartz v. United States, 149 Ct. Cl. 145, 181 F. Supp. 408 (1960). Plaintiff had a responsibility to make a reasonable effort to secure other employment during the interim or else risk being denied compensation. In the face of this obligation, de *386 fendant cannot be heard to say that honoring his employment contract, the earnings from which are deductible from his award here, was “voluntary action * * * unduly delaying the processing of his case.”
Having determined that no part of the delay from September 1954 to July 1955, when plaintiff was required by his employment to remain in Europe, comes within the prohibition of the regulations, it is unnecessary to consider either his reentry permit or his lack of financial means to return to the United States. It should be noted, however, that during this period plaintiff sought to have his hearing held in Europe, again attempting to facilitate, not delay, the clearance process. The time which elapsed between July 1955 and September 1955 cannot be characterized as a period of undue delay either, since plaintiff utilized this brief time to wind up his affairs with Manex and to find someone to take care of his 7-year-old son.
In conclusion, the “interim” during which plaintiff is entitled to reimbursement for loss of earnings extends from November 27, 1953, the day his discharge from Hughes became effective, to October 11, 1955, the date of the favorable security determination. Margolin v. United. States, supra; Greener v. United States, 376 U.S. 149, 161 n. 16 (1964); Williamson v. United States, supra at 243. The loss of interim earnings is measured, therefore, by the difference between the total amount plaintiff would have earned during this whole period at the rate he was receiving on discharge and the total amount he actually earned in that period. Compare O'Brien v. United States, 138 Ct. Cl. 296, 299-300, 151 F. Supp. 282, 284 (1957); Green v. United States, 124 Ct. Cl. 186, 191, 109 F. Supp. 720, 722 (1953); Mendez v. United States, 119 Ct. Cl. 345, 348, 96 F. Supp. 326, 327 (1951). Plaintiff would have earned $20,161.43 for the period November 27, 1953, to October 11, 1955. During that period his wages totaled $4,000, so that his net loss of earnings as a result of his having been denied security clearance amounted to $16,161.43.
Plaintiff is entitled to judgment in the amount of $16,161.43.
*387 FINDINGS OK Fact
1. Plaintiff is a citizen of France and a graduate engineer who was formerly employed by Hughes Aircraft Company, Culver City, California, to design and test aircraft, aircraft structures, components, and aircraft systems. Plaintiff has access to the courts of the United States by right of treaty, effective December 21,1960.
2. On March 21,1951, prior to plaintiff’s employment by Hughes, and apparently in contemplation of plaintiff’s potential employment on work requiring his access to Government classified information, Hughes made application to the Air Force for his access authorization to data classified “Confidential.” This was accomplished by the submission of a form known as “Alien Questionnaire.”
3. By letter dated J anuary 21,1952, the Air Force notified Hughes that temporary consent for plaintiff’s access to work classified as confidential had been granted. The letter further stated that the temporary clearance so granted “expires upon receipt of letter of formal consent or denial, or is voided on 21 January 1953.”
4. By letter to the Air Force dated June 2, 1952, Hughes requested advice as to what action had been taken on its March 21, 1951, application for plaintiff’s access authorization.
5. By endorsement dated June 11,1952, copy of which was forwarded to Hughes by letter of transmittal dated June 14,1952, the Air Force advised that its records showed that plaintiff had been granted temporary confidential clearance on January 21, 1952, that a complete background investigation was in process, and that upon its conclusion a letter of consent or denial would be furnished. In the meantime, on or about June 8,1952, plaintiff was employed by Hughes.
6. By letter dated J anuary 21,1953, the Air Force advised Hughes that plaintiff’s temporary confidential clearance had been extended to July 21, 1953.
7. By letters dated August 12 and September 3, 1953, Hughes requested renewal of plaintiff’s confidential clearance.
*388 8. On September 11, 1953, Hughes made application for plaintiff’s clearance for access to materials and information classified as secret. The application, like the one made for authorization for his access to data classified as confidential, was made by the filing of an alien questionnaire form, part of which was filled out by the employer and part by the employee.
9. On October 19, 1953, Hughes, by telegram, requested extension of plaintiff’s temporary confidential clearance which had expired July 21, 1953.
10. By reply telegram received by Hughes on October 22, 1953, the Air Force informed Hughes that plaintiff’s interim clearance would not be renewed and that an appropriate letter of consent or denial would be furnished when available.
11. By letter dated November 10, 1953, the Western Industrial Personnel Security Board (WIPSB), San Francisco, California, advised plaintiff that the request for his proposed access to certain classified matter at Hughes Aircraft Company, Culver City, California, had been referred to it for review and decision but “based on information now available to it, the Screening Division of this Board has tentatively decided that consent for your access to classified matter of the Army, Navy, or Air Force must be DENIED.” The decision was based on reasons attached to the notice and plaintiff was given 10 days from receipt to reply before the Screening Division reached a final determination. The board also advised plaintiff that in the event he did not reply, the decision would be based on information available to it, without prejudicing his right of appeal.
12. By letter dated November 24, 1953, Hughes notified plaintiff that his employment was being terminated November 27,1953. The letter stated in part: “This action is being taken for one reason only, our lack of success in obtaining security clearance for you from the United States Air Force.” The letter further expressed that plaintiff’s work was entirely satisfactory.
13. Plaintiff was separated on November 27, 1953, and received no statement from Hughes as to the reasons for his separation other than the letter quoted in part above. *389 Plaintiff was advised that there was insufficient work of an unclassified nature at Hughes to permit his retention.
14. By letter mailed November 25, 1953, plaintiff wrote the WIPSB that he had received its letter on November 21,
1953, and requested clarification of the reasons given for the clearance denial. By letter dated December 11, 1953, the WIPSB responded with some clarifications and gave plaintiff 10 days to reply under oath or affirmation.
15. By letter dated December 23,1953, which was received by WIPSB on December 28, 1953, plaintiff responded at length to the statement of the reasons for the tentative denial of security clearance. By letter of December 31,1953, plaintiff submitted additional data to WIPSB which was received by the WIPSB on January 7,1954.
16. By letter dated December 30, 1953, Mr. H. E. Kren, executive secretary of the WIPSB, wrote plaintiff as follows:
We refer to your case pending before this Board and to our previous correspondence with you in this connection.
We have now 'been advised that you have terminated your employment with Hughes Aircraft Company, and therefore security clearance is no longer required in this connection.
Under these circumstances we no longer have jurisdiction and are closing our files without further action. The effect of this is to leave your clearance status in exactly the same condition it was prior to our correspondence with you.
17. Following the termination of his employment at Hughes, plaintiff sought to obtain employment in Long Beach, California, and in New York, without success. From previous experience, during a period of clearance suspension and upon evaluation of his chances to obtain employment in California or elsewhere in the United States in an engineering capacity, plaintiff decided to accept a position in Switzerland with Manex Machinery Corporation. Plaintiff departed from New York for Geneva, Switzerland, on January 2, 1954, and arrived in Geneva around January 15, 1954.
*390 18. Prior to bis departure from Ms residence in Long Beach, California, plaintiff made arrangements with his wife, who remained in California, to forward his mail to General Delivery, Geneva, Switzerland. The letter of December 30,1953, from WIPSB was forwarded to plaintiff in Geneva, and plaintiff’s reply to WIPSB dated January 19, 1954, and received by WIPSB on January 27, 1954, was mailed from Geneva. This latter letter requested clarification of plaintiff’s status, a reply to his letters of December 23 and 31,1953, and a copy of the findings of the Screening Division, and enclosed a copy of Mr. Kren’s letter.
19. By letter dated February 10,1954, the WIPSB wrote plaintiff and advised that it had received his communication of January 19 and had reopened his case. Enclosed was the decision of the Screening Division dated February 10, 1954. This decision, in the form of a letter addressed to plaintiff, stated in part:
The Screening Division determines that, on all the available information, the granting of clearance to boris a. rabiNeatj for access to classified security information is not clearly consistent with the interests of national security.
Plaintiff was advised of his right of appeal in writing and/or the opportunity to request a personal hearing before the Appeal Division, if requested within 30 days after receipt of notice.
20. The aforesaid decision of the WIPSB was sent via registered mail to plaintiff at his Long Beach, California, address, marked for delivery to addressee only. The envelope enclosing said notice of February 10, 1954, from the WIPSB indicates that it was readdressed to plaintiff’s forwarding address in Geneva, Switzerland, but was not sent out of the United States until the summer of 1954 because the post office advised the board it could not be forwarded outside the United States. The record discloses that it was not received by plaintiff until September 24, 1954, at the American consulate in Turin, Italy.
21. As previously noted, plaintiff had come to Geneva in January 1954. Plaintiff’s employment with Manex in Geneva was initially on a commission basis for the sale of *391 machine tools. In connection with this work, plaintiff devoted himself to studying the documentation of the machine tools and to familiarizing himself with the machine tool market since it was a technical field with which plaintiff had had no contact for several years. He also spent some of his time in Switzerland working on a special calculation project for Hughes for which he received $250.
22. After a few months in Geneva, when plaintiff’s study of the market potential for sale of machine tools showed insufficient prospects, he received a direction from Manes to draw the specifications for a new type of machine tool and at that time was put on a salary basis. He began work on this project in late May or early June 1954 and plaintiff was told that if his specifications were satisfactory and accepted by the manufacturers, he would be supervising the construction of the machine and move to Turin where he would be paid on a monthly basis. This project did result in plaintiff’s moving to Turin, Italy, in September 1954 following a month’s camping trip in southern France in August with his young son, who had been sick during the winter in Geneva.
23. Haying received no response to his letter of January 19, 1954, to WIPSB., plaintiff, on March 25, 1954, wrote to ;the Secretary of Defense and noted his Geneva, Switzerland, address. He requested that the Secretary expedite a reply to his January inquiry. Although an appropriate certificate, indicating that no such letter was ever received by the Office of the Secretary of Defense, was submitted by the Government, the correspondence between plaintiff and Congressman Clyde Doyle, whose assistance plaintiff had enlisted in connection with-his security and naturalization problems, clearly establishes that such letter was transmitted and a copy of same forwarded to Congressman Doyle.
24. Receiving ho response to his March 25, 1954, letter to the Secretary of Defense, plaintiff wrote Congressman Doyle on May 21,1954, as follows:
I have not received so far any answer to my letter of March 25 to the Secretary of Defence with regards to my Clearance to work at. Hughes Aircraft Co., and I presume this letter was either lost or misdirected. Do You *392 think it would be possible for You to what Section or Division of the Defence Department comes the San-Francisco Western Industrial Personnel Security Board, so that I can write to the right people and try at least to get an answer. I feel there has been a denial of justice, since the proper procedure has not been followed for my case, and I am therefore justified in pursuing this matter further.
25. By letter dated May 28,1954, the Air Force wrote the Congressman, in response to an inquiry from him, that information regarding the matter (of plaintiff’s access authorization) could be obtained by plaintiff by writing the Air Materiel Command, Wright-Patterson Air Force Base, Ohio, or the WIPSB in San Francisco. This information was conveyed to plaintiff by 'letter dated June 1,1954, from the office of Congressman Doyle.
26. In reply, plaintiff wrote Congressman Doyle’s office on June 4,1954, reciting that he had written to the WIPSB 5 months previously but had received no answer and requested an address where he could write to try and provoke a reply to his letter or some action tending toward that end. He further stated that he knew his clearance had been suspended, since in his opinion that was the primary reason why he lost his job at Hughes and had to leave California.
27. By letter dated June 9,1954, the Congressman in turn wrote to the WIPSB, stating that plaintiff had written him from Geneva that no answer had been received to plaintiff’s letter of January 19,1954, to the board, and requested prompt advice as to the status of the matter and when Mr. Rabineau could expect a reply.
28. By letter dated June 15, 1954, the executive secretary of the WIPSB, in reply to the aforesaid letter of June 9, 1954, stated, in part, as follows:
On receiving Mr. Rabineau’s letter of January 19 we reopened his case, and on February 10 advised him to this effect and also advised him of the final decision of our Screening Division in so far as his clearance was concerned. In accordance with the procedures which we are required to follow, and which have been set forth jointly by the Secretaries of the Army, Navy, and Air Force, this notification went forward by registered mail, return receipt requested, to be signed by addressee only. This *393 notice was returned to us by the Post Office on February 23, ¡bearing a notation that he had moved to Geneva, Switzerland, and that it could not be forwarded outside of the United States. Inasmuch as we had not heard directly from Mr. Kabineau since January 19, and as a matter of fact have not yet heard directly from him, it appeared that there was nothing further we could do. Mr. Babineau’s case is still considered to be in a pending status, and at such time as he may return to the United States and notify us to this effect, we will be pleased to continue processing the case.
29. By letter dated June 28, 1954, plaintiff wrote the WIPSB advising it that he had received, through Congressman Doyle’s office, a copy of its letter of June 15,1954, and requested that its letter of February 10 (the final decision of the Screening Division) be forwarded through the State Department in the diplomatic pouch so that it could be delivered by the local American consulate in Geneva.
30. By letter dated July 15,1954, the WIPSB wrote to the consulate general in Geneva, enclosing an envelope addressed to Mr. Babineau, with the request that it be delivered to him and with the further request that Mr. Babineau accomplish the enclosed return receipt.
31. When the letter of transmittal from the WIPSB arrived in Geneva on or about August 16, 1954, plaintiff had already left that city but he had advised the American consulate in Geneva that he would be vacationing in France and suggested that the envelope be forwarded to the American consulate in Nice. The latter office was instructed to deliver the envelope to plaintiff and forward the receipt to the WIPSB.
32. When the plaintiff discerned that the letter would not be delivered to him in Nice by August 15, he left another forwarding address since he was soon to move to Turin, Italy. The letter was forwarded from the consulate general’s office in Nice, France, to the American, consul in Turin, Italy, where it was delivered to plaintiff, who acknowledged receipt on September 24, 1954, of the WIPSB letters of February 10,1954.
33. By letter dated October 1, 1954, plaintiff wrote the WIPSB from Geneva. In that letter he advised the board *394 that he elected to have a hearing to appear person. He also requested the board to “investigate the possibility of conducting the Appeal Hearing here in Geneva or in Paris before a Field Eepresentative of the U.S. Security Services.” In addition he asked seven questions about the nature of the charges and procedures.
34. By letter dated October 15, 1954, the WIPSB responded to plaintiff’s questions and further stated:
The administrative hearing you request may be conducted only by the Appeal Division of either the Western, Central, or Eastern Industrial Personnel Security Board. Therefore, the time of your hearing would have to depend upon your return to the United States. While we cannot speak for the other Boards, we can say that we are normally able to conduct hearings within thirty to sixty days after receipt of request.
35. By letter dated November 9, 1954, plaintiff wrote the WIPSB from Turin in further regard to having the hearing in Europe, suggesting his appearance before a consular officer for that purpose. Plaintiff further stated in that letter: “If this suggestion cannot be taken in consideration and if it is imperatively required that I return to U.S.A. for the Appeal Hearing, I must state that anxious as I am to clear myself, my financial position is at the present such ‘as to preclude the possibility of undertaking the voyage to United States at my expense and to remain there for a period of several weeks awaiting the Hearing.”
36. By letter dated November 19,1954, the WIPSB wrote plaintiff expressing its regret in being unable to follow the procedure proposed by plaintiff and stated :
We can only suggest that, if you wish to bring the matter to an immediate conclusion, you avail yourself of the procedure outlined in paragraph 17c of the Program Directive, which allows for a determination to be made on the basis of a written reply made by you. In the event you do not wish to do this, we can only suggest that you allow the matter to remain in a pending status until such time as it may be convenient for you to return to the United States and attend an administrative hearing. Until such time, of course, your right to a hearing will be preserved.
*395 Plaintiff desired a personal bearing because previous experiences in 1949 and 1953 indicated to him that written replies did not provide a sufficient basis for a decision by the board.
37. As previously noted, plaintiff is an alien, and for him to reenter the United States it was necessary that he hold a valid reentry permit. The permit which he held expired December 23, 1954. He made application at the American consulate in Turin, Italy, on December 22, 1954, for an extension of his reentry permit to the United States for both himself and his 7-year-old son, who was then living with him. The application stated that he desired the extension for the following reasons:
Working, at present, for an American Firm in Turin on development of new machine. Would therefore like to have an extension for a year.
38. The reentry permit for plaintiff’s son was received by the consulate in Turin on February 3,1955, and delivered to plaintiff; his permit was extended to December 23,1955, and delivered to him in Turin on May 4, 1955. The delay regarding the latter permit is unexplained. Plaintiff made weekly inquiries at the consulate but received no enlightenment about it.
39. As previously noted, in September 1954 when plaintiff received the February 10, 1954, adverse notice on his case, he was in Turin, Italy. His employer, Manex, had placed him in charge of the construction of the prototype of the machine tool for which he had prepared the specifications. This work required his presence, and, under the terms of his agreement with his employer, he was required to be present personally during performance of the work. The construction of the prototype extended from September 1954 through September 1955. Between September 1954 and July 1955, plaintiff could not leave the construction of the prototype for more than a 15-day period, and only with the permission of the president of Manex. In July 1955, plaintiff received final approval from the president of the company to go to the United States for a hearing relative to his security clearance, his right to such hearing having been preserved *396 by defendant’s advice of November 19,1954. also precluded from coming to the United States for a hearing between the period of December 24, 1954, and May 4, 1955, since he did not hold a reentry permit. Up until the month of September 1954, it was only the lack of money and defendant’s failure to advise him of his status which kept plaintiff from coming to the United States for a hearing. From September 1954 to July 1955, both lack of funds and his employment prevented his departure for the United States.
Between July 1955 and September 14,1955, when plaintiff left for New York, plaintiff had to wind up his employment obligations and find someone to care for his young son, which precluded an earlier return to the United States.
40. Following receipt of his reentry permit in May 1955, plaintiff sought financial assistance from Congressman Doyle in a letter dated June 6, 1955. Congressman Doyle inquired as to the possibility of the Government financing plaintiff’s trip to the United States for a hearing and advised plaintiff on June 17,1955, that he was unable to uncover any means by which such arrangement could be made.
41. Plaintiff then contacted his uncle, who was the president of Manex, to secure the funds necessary for the trip to the United States for the hearing, and in July 1955 plaintiff arranged for both the funds and the leave from his employment to return for the hearing.
42. By letter dated August 25, 1955, plaintiff wrote the WIPSB and informed it that he planned to be in New York about the middle of September 1955 and requested prompt transmission of the files of his case to New York since he was undertaking the trip at his own expense. He also requested the board to advise him of the names and addresses of the persons in New York to contact in order to arrange for the hearing at that location.
43. By letter dated August 29, 1955, the WIPSB wrote plaintiff, with a copy to the board in New York, known as the Eastern Industrial Personnel Security Board (EIPSB), and advised that plaintiff’s complete file would be sent to *397 the EIPSB. He was advised to contact the executive secretary of that board for further information.
44. By letter dated September 6,1955, written from Paris, France, plaintiff advised the WIPSB that he had booked air passage to New York City, leaving on September 14, 1955. A hearing was then scheduled for, and held on, September 21, 1955, before the EIPSB in New York.
45. By letter dated October 11, 1955, the EIPSB wrote plaintiff of its decision and granted plaintiff clearance for access to classified information, reversing the decision of the Screening Division of the WIPSB.
46. On October 13, 1955, plaintiff filed a claim with the Air Force for reimbursement for lost wages. The claim did not state the amount sought nor reveal plaintiff’s full earnings during the period of suspension. Plaintiff’s claim was processed by the Air Force during 1955,1956, 1957, and 1958, which processing included the obtaining of data from his employer, Hughes.
47. By letter dated November 9, 1955, Hughes replied to a questionnaire sent to it by the Air Force (Claims Division, Washington, D.C.) stating, in part, as follows:
❖ sfc ❖ *
Mr. Rabineau was terminated 27 November 1953 for the reason that this Company, over an extended period of time, was unable to obtain a clearance which was a prerequisite for the position involved. On 16 February 1954, two months following Mr. Rabineau’s termination, Headquarters, San Bernardino Air Materiel Area, issued a final denial for Mr. Rabineau despite our prior notification of termination. * * *
In view of the above, and the fact that at time of termination Mr. Rabineau was neither employed on classified Government contracts nor suspended because of denial action, we are returning your questionnaire on the grounds that it does not apply in instant case.
48. After considerable correspondence and inquiry, plaintiff, by letter dated June 16, 1959, submitted the dollar amount of his claim, namely, $53,985.84, covering the period October 1953 through June 30, 1959.
*398 49. By letter to plaintiff dated October 9, 1959, tlie Air Force denied the claim, its letter stating as follows:
1. Eeference your claim in the amount of $53,985.84 on a continuing basis for reimbursement for loss of earnings alleged as a result of a denial of clearance issued by the Western Industrial Personnel Security Board on 10 February 1954.
2. This is to inform you that your claim has been carefully reviewed and presented to the Secretary of the Air Force who after due consideration has disapproved your claim. The disapproval of your claim is final and conclusive.
3. Consideration of your claim and supporting documents revealed that your termination of employment was prior to the decision of the Security Board on 10 February 1954, independent of action by the Air Force. Also, it has been determined that you left the United States on 2 January 1954 and were unavailable thereafter until 21 September 1955 for an appeal hearing. It can only be concluded that the prolonged delay thus incurred resulted directly from your own actions and is not the responsibility of the Air Force.
4. Your claim for the period subsequent to the favorable decision of the appeal board on a continuing basis cannot be favorably considered since it extends beyond the period for which reimbursement is authorized.
5. It is hoped that you will understand that as a result of the aforementioned, your claim was necessarily denied.
50. In 1954 plaintiff was paid $250 by Hughes for some special work, and he received $1,365 from Manex. Plaintiff’s earnings in 1955 through October 11, 1955, the date he was granted access authorization (i.e., security clearance) by the EIPSB, totaled $2,385 from Manex.
51. If plaintiff has continued working for Hughes in the same position that he held with the company in November 1953, from November 27, 1953, the date of the termination of his employment, until the decision of the EIPSB on October 11, 1955, granting his access authorization, the parties are agreed his earnings during that period would have been $20,161.43, computed as follows:
*399 From week beginning 11-30-53 to week ending 12-18-53
(3 weeks at $221.69 per week)_ $665. 07
From week beginning 12-21-53 to week ending 1-2-54 (2
weeks at $215.65 per week)_ 431.30
From week beginning 1-4-54 to week ending 12-24-54 (51
weeks at $200.56 per week)_ 10,228. 56
From week beginning 12-27-54 to week ending 10-21-55
(43 weeks at $205.50 per week)_ 8, 836.50
Total_20,161.43
After deducting outside earnings of $4,000, as set forth in finding 50, plaintiff’s net loss of interim earnings is $16,161.43.
CONCLUSION OF LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States and judgment is therefore entered for plaintiff in the amount of sixteen thousand one hundred sixty-one dollars and forty-three cents ($16,161.43).